## FRESNO PUMICITE CO. v. UNITED STATES.

### No. 46548.

United States Court of Claims.

Oct. 4, 1948.

Edward J. O'Connor, of Los Angeles, Cal. (O'Connor & O'Connor, of Los Angeles, Cal., on the brief), for plaintiff.

Currell Vance, of Washington, D. C., and H. G. Morison, Acting Asst. Atty. Gen., for defendant.

Before JONES, Chief Judge, and WHITAKER and HOWELL, Judges.

HOWELL, Judge.

Plaintiff is a corporation organized under the laws of the State of Nevada, and authorized to do business in the State of California.

In 1939, plaintiff was the owner of a certain ninety-nine year mining leasehold on lands in Madera and Fresno Counties, California, on which lands was a pumice deposit referred to in the record as Hill No. 1, more particularly referred to below.

As a part of the Central Valley Project, the Bureau of Reclamation, Department of the Interior of the United States, planned the construction of the Friant Dam across the San Joaquin River, necessitating the acquisition of the lands in question. In particular, said Hill No. 1 was destined to be within the reservoir of the dam and subject to inundation by the waters impounded.

By contract dated September 19, 1939, duly executed by the parties and registered, the plaintiff and others agreed to convey, and the defendant agreed to purchase, the said lands in Madera and Fresno Counties, California, including the said Hill No. 1. The consideration to plaintiff was recited as $140,000 cash, and the contract provided that said conveyance was to be subject to certain exceptions, reservations, and conditions, including the following:

"(p) A condition that the United States will stock pile for Fresno Pumicite Company pebble pumice to be excavated by the United States in the said Northwest Quarter of the Southeast Quarter (NW¼ SE¼) of said Section Three (3) between the elevations of approximately 486 and 498 feet, United States Geological Survey Datum not to exceed 100,000 cubic yards as measured in the stock pile providing such amount of pebble pumice is available at the above location. The starting date of excavation and stock piling of said pebble pumice shall be not later than July 1, 1941, and will be at the rate of not less than an estimated 4,000 cubic yards per month and shall be completed by June 30, 1943. Said pebble pumice shall be stock piled at a point above the flow line of the said Friant Reservoir on the Southeast Quarter of the Southwest Quarter (SE¼SW¼) of Section Three (3) or the North Half of the Northwest Quarter (N½NW¼) of Section Ten (10), Township Eleven (11) South, Range Twenty-one (21) East within 1,000 feet from the quarter section corner between said Sections Three (3) and Ten (10) or at some other point to be agreed upon by Fresno Pumicite Company and the United States."

By deed dated November 16, 1939, duly executed by plaintiff and other owners and duly registered, the conveyance referred to in said contract was effected. Said deed contained the following provision:

"As a part of the consideration herein expressed the United States will stock pile for Fresno Pumicite Company pebble pumicite to be excavated by the United States in the said Northwest Quarter of the Southeast Quarter (NW¼SE¼) of said Section Three (3) between the elevations of approximately 486 and 498 feet, United States Geological Survey Datum not to exceed 100,000 cubic yards as measured in the stock pile providing such amount of pebble pumice is available at the above location. The starting date of excavation and stock piling of said pebble pumice shall be not later than July 1, 1941, and will be at the rate of not less than an estimated 4,000 cubic yards per month and shall be completed by June 30, 1943. Said pebble pumice shall be stock piled at a point above the flow line of the said Friant Reservoir on the Southeast Quarter of the Southwest Quarter (SE¼SW¼) of Section Three (3) or the North Half of the Northwest Quarter (N½NW¼) of Section Ten (10), Township Eleven (11) South, Range Twenty-one (21) East within 1,000 feet from the quarter section corner between said Sections Three (3) and Ten (10) or at some other point to be agreed upon by Fresno Pumicite Company and the United States."

This suit is for an alleged breach by the defendant of said terms quoted, described in the contract as a condition, and in the deed as part consideration.

Under date of January 9, 1942, R. S. Calland, defendant's district engineer, advised plaintiff by letter that the stock piling of the 100,000 cubic yards of pumice as provided in the contract had been completed on October 29, 1941.

During March 1943, plaintiff's president Mr. Lipps, had negotiations with a prospective purchaser for the sale of pebble pumice from the stock pile. As a result of these negotiations Mr. Lipps, in June 1943, called on Mr. Williams, defendant's chief engineer, and informed him that the material stock-piled by the defendant was not pebble pumice. Whereupon Mr. Lipps and Mr. Williams, accompanied by others, visited the stock pile and also the original deposit and both took samples from the stock pile and original deposit in Hill No. 1 for the purpose of having same analyzed.

During this visit plaintiff and his associates observed the site where the excavation had been performed and certain scoop shovel marks on the face of the excavation. Plaintiff concluded and now contends that the defendant excavated the material for the stock pile by beginning from the bottom of the hill and scooping upwards, and in the course of such upward motion of the scoop shovel the material above and below the pebble pumice stratum was loaded into the stock pile, including pumicite, pebble pumice and general conglomerate.

Plaintiff refused to accept said stock pile as performance by the defendant of the terms of said contract and deed, and contends that the stock pile contained a conglomeration of contaminating materials not present in the virgin deposit and that the stock-piled material was useless.

The sole question involves an interpretation of the contract and is whether the defendant did or did not stock pile the material contemplated by the provisions of the contract above mentioned.

The plaintiff contends that the defendant has not performed the terms of the said contract in that it did not stock pile pebble pumice as called for by the contract, and requests compensation for the pebble pumice the defendant agreed to stock pile, at the rate of $5 per cubic yard, or a total sum of $500,000. Further excavation is impossible because the site is covered with water caused by the dam.

Said Hill No. 1 contained deposits of pumicite and pebble pumice with overlying and intervening strata of other material, roughly as depicted on certain exhibits in evidence, said strata being marked for identification from "A" to "F," inclusive.

Strata C and F contained pumicite which the defendant used in the making of mass concrete for the construction of the dam. Stratum E is the stratum referred to in the contract of September 19, 1939, and in the deed of November 16, 1939.

In excavating and removing the pumicite and pebble pumice from Hill No. 1, defendant conducted such operations simultaneously in a series of steps. First, it stripped from the top of the hill and wasted the unsuitable material, down to stratum C; it then went in from the side of the hill and excavated the pumicite from said stratum C, removing said material for its own use.

When sufficient progress had been made in the excavation of stratum C, the material uncovered in stratum D was wasted, and the work of removing and stock piling the pebble pumice in stratum E was begun. As both of these operations progressed to a sufficient point, the excavation proceeded further, so that defendant could remove and use the pumicite in stratum F. In this way, the hill presented a series of steps, with work proceeding on three levels simultaneously.

In excavating and stock piling the pebble pumice in stratum E, the defendant first stripped and wasted the over-lying, unsuitable material. As such excavation progressed, the defendant likewise, from time to time, wasted loads of materials which appeared inferior.

The evidence establishes that the defendant was careful to prevent the commingling of materials in Hill No. 1. All of the hauling was performed by the same trucks and reasonable care was exercised in cleaning the trucks from one type of material before loading another type. It appears that the defendant's inspector exercised reasonable care and diligence in classifying the materials being excavated for the storage stock pile and other disposition.

The ground upon which the stock pile was placed was first stripped and cleaned. Upon this location the defendant stockpiled approximately 100,000 cubic yards of material from Hill No. 1, from between approximate elevations 486 and 498.

Before the defendant began excavations in said Hill No. 1, it sank in said hill several test holes as indicated on the plan of said hill, shown on defendant's exhibit in evidence. Samples from said borings of each foot of elevation were preserved and marked for identification, showing the hole and elevation from which obtained. In particular, such samples were preserved from said stratum E between elevations 486 and 498.

Since the filing of this suit, defendant has sunk 4 test holes completely through the stock pile, and has preserved samples for each 5 feet of each of said holes, and marked said samples for identification. The material from each 5 feet of each boring retained was arrived at by quartering and requartering, a customary and proper method for the retention of material representative of the entire quantity obtained.

The defendant has conducted from the said samples from the original deposit on the one hand and from the stock pile on the other, two tests, to wit, a physical comparison by screening to obtain the sizes of the particles and a petrographic examination for indentification of the various mineral components of the sample, a description of the relative proportions of same, and a description in detail of the various particles which composed the samples as to rock types, and the characteristics of each of the particles as to texture, structure, and crystallinity. The two tests conducted are the tests necessary and appropriate for a comparison of the two materials.

The screening tests showed that on the average the stock pile material compares with the material in the original deposit when tested on a 200-mesh screen, as follows:

|  | Retained | Passed |
| --- | --- | --- |
| Deposit .............. | 81.4 | 18.6 |
| Stock pile .......... | 73.3 | 26.7 |

It is obvious that the necessary operations of excavating, hauling, and stock piling would naturally effect an increase in the percentage of fines passing the 200-mesh screen.

A petrographic examination indicated that there was very little distinction between the various samples from the stock pile and from the original deposit.

Many of the samples taken also contained a small proportion of sand and rock particles which, in the opinion of the sci-

entist, were included in the original deposit by streams in the geological past. A few of the samples included irregular particles of clay stone, a soft rock composed largely of clay. The sand, rock particles, clay stone and clay may or may not be present in any particular deposit of pumice.

The average specific gravity was the same for samples from the stock pile as those from the original deposits.

Pumicite is a volcanic ash, consisting primarily of rhyolite with glass mixture, and is equivalent to granite. It is used commercially in scouring powders, and as an admixture or cement replacement in concrete. Part of the pumicite deposit in Hill No. 1 was used by the defendant in concrete for certain portions of the dam nearby.

Pumice or pebble pumice is a volcanic material of similar constituency as pumicite, but distinguished from it because of the size of the grains, the division being established, as a practical matter, by the use of a 200-mesh sieve or screen. The grains or pebbles held by the sieve are classified as pebble pumice, and range in various sizes up to one and one-half inches and much larger. The physical characteristic of pebble pumice, as distinguished from pumicite powder, is the presence of small air cavities or cells in its formation. It is porous, has insulating qualities, and is light in weight. Its uses are generally applied wherever insulation is desired, in acoustic plaster, fillings between walls, and as an aggregate in cement tile blocks for buildings.

In attempting to use the material from the stock pile mined by the defendant, plaintiff found a considerable percentage of pebble pumice of various gradation, and that there was an assortment of pebble pumice in all sizes, together with a considerable amount of such other material as pumicite and sharp pumice sand. In order to manufacture their product as they had theretofore done with the pebble pumice mined by hand, it was necessary for them to screen out some of the larger material and all of the fines because it was found that the sharp fines had the tendency to pull the cement and water down to the bottom of the mold and to prevent a proper blend in the mix of the concrete in the block.

It was found that with the hand screening method previously employed, the expense of performing the screening operation was considerable, but such cost of screening is not satisfactorily shown by the evidence.

Earlier tests conducted in 1930 indicated an estimated volume of pebble pumice according to particle size amounting to approximately 7,228,000 cubic yards contained in Hill No. 1 and other areas included in plaintiff's lease. The amount of pebble pumice involved in the contract was certainly available and the present question is what did the parties mean or intend when they used the term "pebble pumice" in the contract.

As has been noted, the plaintiff did protest that the defendant in its operations in removing the pebble pumice scooped upwards instead of dipping down into the pebble pumice stratum.

On the proof, however, it appears that the defendant exercised reasonable care and diligence in classifying the materials being excavated for the storage stock pile and other disposition and that the method employed by the defendant in removing the stock pile of pebble pumice was the practical and normal procedure in performing this work.

The screening test showed that the percentage of fines passing a 200-mesh screen for the original deposit was 18.6 percent and for the stock pile was 26.7 percent. This increase in fines is a normal result of the method of excavating the material with heavy equipment over the deposit area, the loading and dumping, and did not result from carelessness and the mixing of contaminating materials by the defendant in its excavation and hauling the pebble pumice from the stratum specified.

The plaintiff insists that the presence of pumicite and fines in pebble pumice destroys its commercial value, yet at the same time admits that these materials could be removed by a special process, including drying and screening. The cost of removing these materials by a special process has not been established by the evidence.

The proof on the part of the plaintiff from its own experience is that the fair market value of pebble pumice at the mouth of the mine is the sum of $2 per cubic yard. The proof is not satisfactory as to an amount of cost required for loading and stock piling which should be added to the cost at the mouth of the mine, but upon the whole record, we find that the fair, reasonable market value of pebble pumice, as mined by the plaintiff is the sum of $2.50 per cubic yard stock-piled.

From a consideration of all the facts in this case, it appears to us that the defendant actually stock-piled approximately 73,300 cubic yards of pure pebble pumice. It is impossible to fix an amount which would represent the cost of separating such pebble pumice from the pumicite and conglomerate materials contained in the stock pile since the evidence is not complete on this question.

Before the excavations were begun, the defendant sank test holes and obtained samples from said borings of each foot of elevation, and therefore had notice that a certain percentage of pumicite and other contaminating materials would be encountered. From these samples it could have been readily ascertained that in order to stock pile at least 100,000 cubic yards of "pebble pumice" an allowance would have to be made for not only the percentage of contaminating materials which was disclosed by the tests, but a reasonable additional allowance which would be required to compensate for the use of steam shovels and other heavy equipment.

We are unable to agree with plaintiff that the defendant has completely failed in its performance of the contract. The conclusion is inescapable that the defendant has stock-piled 100,000 cubic yards of pebble pumice, pumicite and conglomerate material. By reason of the methods commonly employed in removing deposits of pebble pumice with which both parties were fully acquainted, it could reasonably be expected that a certain percentage of the stock pile would be of no commercial value as pebble pumice.

It appears that the percentage of fines passing a 200-mesh screen from the original deposit was 18.6 percent, for which the defendant should have made an allowance in the stock pile. The defendant not only failed to do this, but in its methods of stock piling there resulted an increase in fines of 8.1 percent.

There is another matter which should be taken into consideration, and that is that both plaintiff and defendant knew that the deposit site would be inundated when the defendant's dam was placed in operation. That was the reason for specifying the exact site at which the stock pile should be placed by the defendant in order for it to be above the area later to be inundated. Therefore, the plaintiff is precluded forever from obtaining the actual net shortage of pebble pumice required to be stock-piled under the terms of the contract.

We believe that when the parties used the term "pebble pumice" in the contract they meant "pebble pumice" and not pumicite and other conglomerate materials. Accordingly, the plaintiff is entitled to recover a judgment which would compensate for the deficiency in pebble pumice actually stock-piled. As nearly as possible from the evidence before us, this can be calculated at 26.7 per cent of 100,000, or 26,700 cubic yards, at a value which we find to be $2.50 per cubic yard. Plaintiff is entitled to judgment for the amount of $66,750.

It is so ordered.

WHITAKER, Judge; and JONES, Chief Judge, concur.

MADDEN, Judge (dissenting).

The court has decided, and I agree, that the Government used the methods contemplated by the parties to the contract in making the stock pile of materials here in question, and exercised reasonable care and diligence in its carrying out of those methods. It has thereby decided that the contention upon which the plaintiff's whole case rests is unfounded. That contention is that the Government agreed, in its contract, to make a stock pile which would contain as large a percentage of pebbles of pumice, as distinguished from fines and other materials, as the materials previously excavated by the plaintiff by hand methods contained. Such an operation, applied to the tonnage stipulated in the contract, would have been whol-

864

ly impracticable, and the court has held that there was no such agreement to do it.

However, the court holds, and I think erroneously, that the contract required the Government to lay up such a pile of materials, including fines, that out of it could be screened 100,000 tons of pebble pumice. Since, the court concludes, there were only 100,000 tons in all in the pile, and since 26.7 percent of that would have been screened out if the material had been screened, the court concludes that there was a shortage of 26,700 yards of pure pebble pumice in the pile, for which the court awards the plaintiff $66,750 in damages for breach of contract. The court has thus inserted the word "pure" before the words "pebble pumice" in the contract, although neither party contends that the contract had that meaning. The court has found that in the original deposit there was 18.6 percent of fines, so that if the contract had contemplated hand excavation, a pile of 100,000 tons in all would have contained 18,600 tons of fines. The plaintiff, in its use of pebble pumice in the past, had screened it very little, so it would have used material from such a stock pile practically without screening. It is impossible to suppose that the plaintiff would have claimed that the stock pile should contain, not 100,000 tons, as it said, but some 123,000 tons so that if it had been thoroughly screened, which nobody intended to do or thought it was necessary to do, there would have emerged 100,000 tons of "pure" pebble pumice, which nobody contends that the contract called for.

The judgment of the court includes, therefore, payment for 18,600 tons of asserted shortage which would have existed if the Government had excavated by hand, but which 18,600 tons of fines would have, in fact, been practically all used by the plaintiff if it had operated in the same way that it did before the Government came on the scene, i. e., by hand excavation and without screening. Could it then, having used practically all of the 18,600 tons of materials in the normal course of its operations, have claimed that the Government should furnish it

another 18,600 tons of pure pebble pumice? It seems to me that the court, having decided that the contract did not call for laying up a pile of pure pebble pumice, or of any other kind of pebble pumice except what a practicable operation, reasonably and prudently carried out, would produce, should conclude that the tonnage of 100,000 tons called for in the contract meant that tonnage of that kind of material. There is no evidence and no contention that the parties meant, by their contract, that there was to be more than 100,000 tons of anything in the stock pile. The whole dispute is as to whether the material that was put in the stock pile was the proper kind of material to put there, and the court has held that it was.

The court has awarded the plaintiff $66,-750 as damages for not having had piled up for it some 30,000 tons more of material which, the plaintiff contends, is worthless and useless. The plaintiff's contention is that it has made no use and can make no use of the 100,000 tons already in its stockpile. Obviously the plaintiff has not, therefore, been damaged by $66,750 or any other amount by not having a still larger pile of worthless material. The court's decision that the material put into the stock pile was of the quality intended by the contract to be put there, coupled with the plaintiff's evidence and argument that the material is worthless, add up to the result that the plaintiff made a contract the performance of which was of no benefit to it. That being the case, partial nonperformance could not call for more than nominal damages; which we are not authorized to award. And to award substantial damages, as the court has done, in the face of the plaintiff's evidence that complete performance of the contract, as the court has construed the contract, would have been worthless to it, makes the court's conclusion as to the amount of the damage a pure speculation.

I would dismiss the plaintiff's petition.

Judge LITTLETON has authorized me to say that he agrees with what I have written.